Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R.D.,<br><br>             Plaintiff,<br><br>vs.<br><br>ANTHEM BLUE CROSS BLUE SHIELD,<br>and the WELLS FARGO & COMPANY<br>HEALTH PLAN<br><br>             Defendants. | COMPLAINT |

Plaintiff R.D., through her undersigned counsel, complains and alleges against

Defendants Anthem Blue Cross Blue Shield ("Anthem") and the Wells Fargo & Company

Health Plan ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. R.D. is a natural person residing in York County, South Carolina.

2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield

   network of providers. Anthem was the third-party claims administrator, as well as the

   fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). R.D. was a participant in the Plan at all relevant times.

4. R.D.'s daughter J.D. received medical care and treatment at Open Sky Wilderness Therapy ("Open Sky") from September 4, 2019, to December 4, 2019. Open Sky is a treatment program that operates in Colorado and Utah and provided sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Anthem, acting in its own capacity or through its subsidiary, Anthem UM Services, denied claims for payment of J.D.'s medical expenses in connection with her treatment at Open Sky.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Wells Fargo, the Plan sponsor, has ongoing and significant business operations in Utah, Anthem has thousands of ERISA participants and beneficiaries that it either insures or for whom it acts as third party administrator in Utah, and the treatment at issue took place in Utah.

8. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's

desire that the case be resolved in the State of Utah where it is more likely that her privacy will be preserved.

9. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## **BACKGROUND FACTS**

### **J.D.'s Developmental History and Medical Background**

10. When J.D. started middle school, she began to experience severe bullying from her peers. While she had exhibited depression in the past, it became increasingly worse and she was found to be self-harming and gained a significant amount of weight. This made the bullying she was experiencing more severe.

11. J.D. started acting defiantly and turned to drugs and alcohol to self-soothe. She abused a wide variety of different substances, and her substance abuse intensified following a sexual assault in the seventh grade. J.D. initially kept the assault to herself and did not seek any help. She was placed in therapy to deal with her other issues, but she was seldom cooperative and often refused to attend or participate.

12. J.D. struggled to make friends and spent much of her time isolating herself. J.D. started seeing a new therapist and a psychiatrist but it wasn't particularly effective.

13. After one of her close friends attempted suicide, J.D. cut herself very deeply then ran away from home. She was discovered by her parents and was taken to the hospital, after which she started outpatient treatment.

14. J.D. was fired from her job which exacerbated her self-harming and she confessed to her mother that she was feeling suicidal. J.D.'s mother then took her to her therapist instead of school, and J.D. jumped out of the car and ran.

15. She was later apprehended by the police and hospitalized, after which she started attending a treatment program called Three Rivers.

16. J.D. was again sexually assaulted at this program and had a very negative experience. She became increasingly defiant and self-destructive and was caught shoplifting. She told the police that she was feeling suicidal and was taken to the hospital for assessment. She then began attending a program called Newport Academy.

17. J.D. attempted to run from the program and her treatment team recommended that she leave the program and go somewhere else. She returned to outpatient care, but continued to steal from her mother, commit acts of self-harm, and sneak out. J.D. was again hospitalized after another severe self-harm incident.

18. After this, J.D. acknowledged she needed help, but then ran away from home. She eventually contacted her family for a ride and began attending another mental health program in a hospital setting.

19. The family moved away to Massachusetts to separate J.D. from the people that bullied her and the friends she used drugs with.

20. J.D. was placed in a partial hospitalization program. She mentioned that she was feeling suicidal, and the clinicians recommended further treatment. J.D. became frustrated and

walked out of the facility. The authorities were contacted and she was again hospitalized.

Shortly afterwards J.D. was admitted to Open Sky.

**Open Sky**

21. J.D. was admitted to Open Sky on September 4, 2019.

22. In correspondence dated September 16, 2019, and September 18, 2019, Anthem denied

payment for J.D.'s treatment at Open Sky, stating, in part:

> The request tells us you went to a residential treatment center for your mental
> health condition. The plan clinical criteria considers [sic] residential treatment
> medically necessary for those who are a danger to themselves or others (as shown
> by hearing voices telling them to harm themselves or others or persistent thoughts
> of harm that cannot be managed at a lower level of care). This service can also be
> medically necessary for those who have a mental health condition that is causing
> serious problems with functioning. (For example, being impulsive or abusive,
> very poor self care, not sleeping or eating, avoidance of personal interactions, or
> unable to perform usual obligations). In addition, the person must be willing to
> stay and participate, and is expected to either improve with this care, or to keep
> from getting worse. The information we have does not show you are a danger to
> yourself or others, or you are willing to stay and participate in treatment. For this
> reason, the request is denied as not medically necessary. There may be other
> treatment options to help you, such as outpatient services. You may want to
> discuss these with your doctor. It may help your doctor to know we reviewed the
> request using the MCG guideline Residential Behavioral Health Level of Care,
> Child or Adolescent (ORG: B-902-RES).

23. In addition, Anthem sent a separate denial rationale dated September 20, 2019, which

stated, in part:

> The request tells us your provider is asking to continue your treatment through a
> Wilderness program. This treatment is not approvable under the plan clinical
> criteria because there is no proof or not enough proof it improves health
> outcomes. For this reason, the request is denied as investigational and not
> medically necessary. There may be other settings to help you, such as outpatient
> treatment. You may want to discuss these with your doctor. It may help your
> doctor to know we reviewed this request using the plan medical policy Wilderness
> Programs (Med.00122 and MCG Guideline Residential Behavioral Health Level
> of Care, Child or Adolescent (ORG: B-902-RES)

24. R.D. enlisted the services of the law office of Brian King ("the Firm") and on March 16, 2020, the Firm appealed the denial of payment for J.D.'s treatment at Open Sky. The Firm wrote that Anthem had not complied with its obligations under ERISA and that among other failures to comply with the statute, Anthem had failed to identify its reviewers, and had refused to provide contact information for its appeals and grievances department despite multiple requests.

25. In addition, Anthem's multiple justifications for the denial hindered the Firm's ability to properly appeal the adverse decision.

26. The Firm wrote that despite its requests for the guidelines utilized by Anthem, these had not been provided. However, it appeared that these guidelines imposed requirements which were inconsistent with a sub-acute inpatient level of care such as a risk of serious harm to self or others.

27. The Firm wrote that despite Anthem's assertions to the contrary, J.D. was at risk of harm outside of the appropriate treatment environment and her care at Open Sky was medically necessary.

28. The Firm included letters of medical necessity with the appeal. In a letter dated September 6, 2019, Karyn Kaminski, MSW, LCSW, LCAS, wrote:

> On August 15, 2019 I was hired by [the D. family] to assist them in finding an appropriate therapeutic intervention for their daughter, [J.D.] (DOB [redacted]). They made multiple attempts to help her with her depression, self-harm cutting, high risk behaviors, drug and alcohol abuse, suicidal ideation, overeating, school refusal, vandalism and defiant behaviors. [J.D.] has experienced multiple short-term treatment episodes, with mixed results including outpatient therapy, inpatient residential treatment, partial hospitalization and crisis hospitalization due to suicide attempts and suicidal ideation. She has been hospitalized multiple times in the past year due to suicidal ideation and self-harm, with diminishing success.
>
> Through these multiple crisis placements, [J.D.] was noted to have become more ambivalent about the effectiveness of therapy, and more treatment resistant. At

the same time, her behaviors continued to escalate including sneaking out of the house, skipping school, drug seeking and finding alternative methods of suicide or self-harm. With [J.D.]'s repeated treatment episodes, it was apparent that trying the same type of intervention again would not provide different results. After multiple lengthy conversations with the family I recommended that they look at enrolling her in Open Sky Wilderness Therapy program, in Durango Colorado.

Many young people do not respond to traditional talk therapy. Wilderness programs offer an active way for staff and students to relate to one another, so the emphasis is not solely on talk. Wilderness programs place youth in unique settings where they are often quite unsure of themselves. Moving out of their familiar environment serves to reduce defensiveness and encourages changes in relationships with adult leaders. Open Sky incorporates an element of perceived risk, thereby encouraging participants to move beyond their comfort zones and face their issues and fears. They use a small-group format and encourage interdependence among group members. The 24/7 or 'round the clock group experience is a very powerful teaching tool.

Open Sky was specifically recommended due to their clinical sophistication, as well as the level of safety measures in place to contain [J.D.]'s self-harming behaviors. Her assigned therapist, Kirsten Bolt has years of experience and success in working with girls like [J.D.] Additionally, Open Sky will provide a 24/7 assessment of her behaviors helping clarify diagnoses and types of setting she does best in.

I am an Independent Educational Consultant and therapist, and member of IECA [Independent Educational Consultants Association], NATSAP [National Association of Therapeutic Schools and Programs], NASW [National Association of Social Workers], and ARHE [Association of Recovery in Higher Education]. I am a Licensed Clinical Social Worker and Licensed Clinical Addiction Specialist in the state of North Carolina. It is my professional opinion that without significant intervention, [J.D.] is at extreme risk for long-term consequences

29. Rabiya Hasan, M.D. wrote in a letter dated September 9, 2019:

I am writing this letter regarding my patient, [J.D.], DOB [redacted]. I have been seeing [J.D.] since February 2018 for her psychiatric treatment. She has diagnoses of Borderline Personality Disorder, Major Depressive Disorder, severe and recurrent, and Unspecified Anxiety.

[J.D.]'s symptoms have included a severely depressed mood, anhedonia, poor sleep, poor energy, increased appetite, and recurrent self-harm thoughts and self-harm behavior. She has had frequent cutting behavior and reports a history of previous suicide attempts. She is very guarded and often does not participate in appointments with me or in therapy. Over the last year and a half, [J.D.] has displayed worsening mood and escalating self-harm behavior. Her overall motivation for change and investment in treatment has worsened. She has become

treatment resistant. She has had multiple medication trials, including Zoloft, Prozac, Cymbalta, Trintellix, Lamictal and Abilify. She is currently taking Celexa, BuSpar, Vistaril, Trazodone and Topamax. Most recently, [J.D.] has been engaging in drug use, primarily marijuana, leaving home without permission, and has reported no change in her depression or thoughts of self-harm. She has had multiple levels of treatment, including 2 inpatient admissions to Levine Children's Hospital for thoughts of self-harm, and 2 admissions in February 2018 and October 2018 to Behavioral Health Charlotte for thoughts of self-harm and self-harm behavior. She has been in long-term treatment in Newport Academy, and has had partial hospitalization, crisis hospitalization, intensive outpatient therapy, and some DBT. Due to her overall lack of progress with multiple medication trials and multiple modalities of treatment, I feel that it is medically necessary for [J.D.] to be admitted to a more intensive long-term treatment program. When multiple levels of treatment had failed, it is a standard of care for a patient to be referred to a more intensive treatment program, such as a PRTF [Psychiatric Residential Treatment Facility].

Specifically, [J.D.] needs a program that provides different type of treatment than what she has already received. Immersion into a program that focuses on healthy coping skills, positive self-esteem, and regaining independence for maintaining her own safety appears to be the best option for her at this time. She needs a program that provides 24/7 supervision due to the severity of her unsafe thoughts and behaviors.

Given her psychiatric issues as well as failure with treatment services, I feel that [J.D.] needs to be admitted to a PRTF for longer term stabilization. I certify that this treatment for [J.D.] is medically necessary for her psychiatric stability. Thank you for your consideration.

30. The Firm wrote that J.D.'s care was consistent with the recommendations of her treatment team and that outdoor behavioral health services were nationally recognized and proven to be effective.

31. The Firm included research articles demonstrating the benefits and clinical efficacy of outdoor behavioral health treatment.

32. The Firm pointed out that Open Sky was licensed in both Utah and Colorado and had maintained this licensure ever since it was granted. In addition, Open Sky adhered to all applicable rules and regulations.

33. The Firm wrote that it had requested certain materials from Anthem, including:

> The identities of all individuals with clinical or medical expertise who evaluated [J.D.]'s claim; copies of those individuals' curriculum vitae; copies of any memoranda, emails, reports, or other documents reflecting the rationale of those reviewers; a complete copy of both the residential treatment medical necessity criteria and the partial hospitalization criteria utilized by Anthem; a complete copy of the medical necessity criteria utilized by Anthem for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment; and complete copies of any and all internal records compiled by Anthem in connection with [J.D.]'s claims.

However, the Firm stated that it had not received these materials, which hindered it from properly appealing the denial of payment. The Firm again requested this documentation.

34. On April 16, 2020, Anthem provided an Explanation of Benefits statement which offered three separate denial rationales for J.D.'s treatment depending on the dates of service. It stated in relevant part:

> [For dates of service 11/1/19 – 11/30/19]
> *182: The service(s) you have performed require a pre-authorization/referral. We are unable to pay this claim because a pre-authorization/referral was not obtained.
>
> [For dates of service 9/4/19 – 9/30/19]
> *001: This isn't a covered service on your plan.
>
> [For dates of service 10/1/19 – 10/31/19]
> *006: A clinical review has determined this amount not allowable due to appropriateness or necessity of this service. Refer to your plan of coverage booklet for details regarding plan definitions/exclusions/limitations (what is not covered). A medical policy or guideline was used in making this decision and you are entitled to receive, upon request and free of charge, a copy of that medical policy or guideline.

35. In a letter dated May 15, 2020, Anthem offered yet more new justifications for the denial of payment. The letter contains two boilerplate responses as to why payment was denied each giving a different justification. The letter states in pertinent part:

> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. A request was made for you to receive residential treatment for your mental health condition. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do

not think this is medically necessary for you. We believe our first decision is correct for the following reason. The plan's clinical criteria considers residential treatment medically necessary when it is provided in a structured, facility-based setting and certain criteria are met. The request tells us your provider was asking to get this treatment at a Wilderness program. This treatment is not approvable under the plan clinical criteria because there is no proof or not enough proof it improves health outcomes. For this reason, the request is denied as not medically necessary. You could have been treated with outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed this request using the plan medical policy Wilderness Programs (Med.00122).

We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to have residential treatment center care. The reason we were given for this was that you were at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason: you were not at risk for serious harm that you needed 24 hour care. You could have been treated with outpatient services. We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

36. Anthem did not provide any of the documents or information requested by the Firm in its

March 16, 2020, letter.

37. On October 13, 2020, the Firm again requested a copy of the documentation it had yet to

receive.[1] In particular, the Firm asked to be provided with:

- A complete copy of [J.D.]'s claim file including, but not limited to, the identities of all individuals with clinical or medical expertise who evaluated [J.D.]'s claim for Anthem, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying [J.D.]'s coverage;
- A complete copy of both the residential treatment medical necessity criteria and the partial hospitalization criteria utilized by Anthem in determining that [J.D.]'s residential treatment was not medically necessary and that she was appropriate for outpatient services;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled

---

[1] At times during the appeals process, Anthem stated that it would not produce documentation without the appropriate authorization forms. The Firm did submit authorization forms when necessary, including in response to these requests.

nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment.  This is necessary to allow this firm to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;

- Complete copies of any and all internal records compiled by Anthem in connection with [J.D.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [J.D.]'s insurance plan is operated; and
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between Anthem and [R.D.]'s employer.

38. Anthem did not respond to the Firm's October 13, 2020, letter.

39. On December 28, 2020, The Firm submitted another appeal of the denial of payment for J.D.'s treatment. The Firm contended that Anthem continued to fail to abide by its obligations under ERISA and asked with so many contradictory justifications for denying payment how they were supposed to engage in a meaningful dialogue or know which denial rationales to respond to. The Firm asked Anthem to explain why its reasons for denying payment continued to shift.

40. The Firm wrote that Anthem had no basis for a denial based on preauthorization as preauthorization had been attempted. The Firm contended that J.D.'s treatment was medically necessary and it was the unequivocal opinion of all of her treatment providers that J.D. required a high level of care and intervention to avoid suffering long-term consequences.

41. The Firm wrote that despite Anthem's assurance that "a clinical review was performed", Anthem did not actually elaborate on the results of this review or why this resulted in a denial of payment.

42. The Firm stated that it had yet to receive the guidelines or materials it requested and reiterated that Open Sky was a licensed program which provided treatment in a secure sub-acute inpatient setting.

43. The Firm reiterated that without the treatment she was receiving, in a 24-hour specialized facility, J.D. would be at serious risk of harm.

44. The Firm pointed out that J.D.'s medical records at Open Sky showed that she was suffering from concerning behaviors and conditions, such as auditory hallucinations and resistance to treatment.

45. The Firm also cited to records showing the progress J.D. had made while at Open Sky.

46. The Firm again requested the documentation it had not received and argued that it was greatly hindered in properly appealing the denial of benefits when this information was withheld.

47. Plaintiffs received no response to this appeal.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

48. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

49. Anthem and the Plan failed to provide coverage for J.D.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

50. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

51. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled.

52. Anthem failed to substantively respond to the issues presented in R.D.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

53. Anthem relied on a litany of inconsistent and varied justifications for the denial of payment and did not meaningfully respond to the arguments raised in the appeal process.

54. Tragically, Anthem's assertion that J.D. was not a at risk for serious harm and did not need further treatment was irrevocably proven wrong when she took her own life in 2021.

55. Anthem and the agents of the Plan breached their fiduciary duties to J.D. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.D.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of J.D.'s claims.

56. The actions of Anthem and the Plan in failing to provide coverage for J.D.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

57. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

58. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

59. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

60. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

61. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of

benefits for mental health or substance use disorder treatment. 29 C.F.R.

§2590.712(c)(4)(ii)(A), (F), and (H).

62. The criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

63. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for J.D.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

64. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

65. Anthem and the Plan evaluated J.D.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice.

66. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

67. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that J.D. received. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as "The plan clinical criteria considers [sic] residential treatment medically necessary for those who are a danger to themselves or

others (as shown by hearing voices telling them to harm themselves or others or

persistent thoughts of harm that cannot be managed at a lower level of care)."

68. This statement demonstrates that Anthem closely associates a risk of harm to self or

others to the criteria utilized to evaluate residential treatment care.

69. This improper use of acute inpatient criteria was a nonquantitative treatment limitation

that cannot permissibly be applied to evaluate the sub-acute level of care that J.D.

received.

70. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities

for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan

benefits.

71. Treatment provided in an acute care environment is necessarily distinct from treatment

provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute

claim will result in a near universal denial of benefits, regardless of the medical necessity,

clinical appropriateness, or nature of the treatment.

72. In addition, the level of care applied by Anthem failed to take into consideration the

patient's safety if she returned to a home environment, as well as the risk of decline or

relapse if less intensive care than what was medically necessary was provided.

73. Generally accepted standards of medical practice for medical and surgical rehabilitation

under the Plan take into consideration safety issues and considerations of preventing

decline or relapse when admission into an intermediate care facility, such as a skilled

nursing or rehabilitation facility, is approved.

74. Anthem also denied J.D.'s treatment at Open Sky in large part on the basis that it was

experimental or investigational. The National Uniform Billing Committee, the

organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

75. Plaintiff is aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by Anthem.

76. The Plan purports to rely on generally accepted standards of medical practice when it evaluates the medical necessity of covered benefits. Generally accepted standards of medical practice for residential treatment centers include policies such as regular meetings with a mental health professional and evidence-based treatment interventions.

77. With regards to the treatment at Open Sky in particular, Anthem made no effort to address how an exclusion for wilderness care which Anthem alleged to be experimental and without merit, could be reconciled with the treatment offered at Open Sky, a facility which had been licensed by the State of Utah.

78. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

79. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for her loss arising out of the Defendants' violation of MHPAEA.

80. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount owed for J.D.'s medically necessary treatment at Open Sky under the terms of the Plan, plus pre and post-judgment interest;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3.    Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.    For such further relief as the Court deems just and proper.

DATED this 6th day of October, 2023.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiff

County of Plaintiff's Residence:
York County, South Carolina